IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| **ARTHUR TREXLER,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **vs.** ) | **Civil No. 13-cv-506-CJP**[1] |
| ) | |
| **CAROLYN W. COLVIN,** ) | |
| **Acting Commissioner of Social** ) | |
| **Security,** ) | |
| ) | |
| **Defendant.** ) | |

### MEMORANDUM and ORDER

**PROUD, Magistrate Judge:**

In accordance with 42 U.S.C. § 405(g), plaintiff Arthur Trexler seeks judicial review of the final agency decision denying his application for Supplemental Security Income (SSI) benefits pursuant to 42 U.S.C. § 423.

### Procedural History

Plaintiff applied for benefits in July, 2009, alleging disability beginning on March 30, 2009. (Tr. 11). After holding an evidentiary hearing, ALJ Michael Scurry denied the application in a written decision dated January 23, 2012. (Tr. 11-20). The Appeals Council denied review, and the decision of the ALJ became the final agency decision. (Tr. 1). Administrative remedies have been exhausted and a timely complaint was filed in this Court.

### Issues Raised by Plaintiff

Plaintiff raises the following points:

---

[1] This case was referred to the undersigned for final disposition on consent of the parties, pursuant to 28 U.S.C. §636(c). See, Doc. 9.

1.    The ALJ erred in not giving appropriate weight to the opinions of his treating physician, Dr. Rachel Myers.

2.    The ALJ's determination of plaintiff's residual functional capacity (RFC) was not supported by substantial weight as he failed to account for plaintiff's mental limitations and failed to employ the "special technique" to assess the severity of plaintiff's depression.

## Applicable Legal Standards

To qualify for SSI, a claimant must be disabled within the meaning of the applicable statutes.[2]   For these purposes, "disabled" means the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."   **42 U.S.C. §423(d)(1)(A).**

A "physical or mental impairment" is an impairment resulting from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques.   **42 U.S.C. §423(d)(3).**   "Substantial gainful activity" is work activity that involves doing significant physical or mental activities, and that is done for pay or profit.   **20 C.F.R. §§ 404.1572.**

Social Security regulations set forth a sequential five-step inquiry to

---

[2]   The statutes and regulations pertaining to Disability Insurance Benefits (DIB) are found at 42 U.S.C. § 423, et seq., and 20 C.F.R. pt. 404.   The statutes and regulations pertaining to SSI are found at 42 U.S.C. §§ 1382 and 1382c, et seq., and 20 C.F.R. pt. 416.   As is relevant to this case, the DIB and SSI statutes are identical.   Furthermore, 20 C.F.R. § 416.925 detailing medical considerations relevant to an SSI claim, relies on 20 C.F.R. Pt. 404, Subpt. P, the DIB regulations. Most citations herein are to the DIB regulations out of convenience.

determine whether a claimant is disabled.   The Seventh Circuit Court of Appeals

has explained this process as follows:

> The first step considers whether the applicant is engaging in substantial gainful activity. The second step evaluates whether an alleged physical or mental impairment is severe, medically determinable, and meets a durational requirement. The third step compares the impairment to a list of impairments that are considered conclusively disabling. If the impairment meets or equals one of the listed impairments, then the applicant is considered disabled; if the impairment does not meet or equal a listed impairment, then the evaluation continues. The fourth step assesses an applicant's residual functional capacity (RFC) and ability to engage in past relevant work. If an applicant can engage in past relevant work, he is not disabled. The fifth step assesses the applicant's RFC, as well as his age, education, and work experience to determine whether the applicant can engage in other work. If the applicant can engage in other work, he is not disabled.

**Weatherbee v. Astrue**, 649 F.3d 565, 568-569 (7th Cir. 2011).

Stated another way, it must be determined: (1) whether the claimant is presently unemployed; (2) whether the claimant has an impairment or combination of impairments that is serious; (3) whether the impairments meet or equal one of the listed impairments acknowledged to be conclusively disabling; (4) whether the claimant can perform past relevant work; and (5) whether the claimant is capable of performing any work within the economy, given his or her age, education and work experience.   **20 C.F.R. §§ 404.1520; Simila v. Astrue**, 573 F.3d 503, 512-513 (7th Cir. 2009.

If the answer at steps one and two is "yes," the claimant will automatically be found disabled if he or she suffers from a listed impairment, determined at step three.   If the claimant does not have a listed impairment at step three, and cannot perform his or her past work (step four), the burden shifts to the Commissioner at

3

step five to show that the claimant can perform some other job.  **Rhoderick v. Heckler, 737 F.2d 714, 715 (7th   Cir. 1984).  See also Zurawski v. Halter, 245 F.3d 881, 886 (7th Cir. 2001**) (Under the five-step evaluation, an "affirmative answer leads either to the next step, or, on Steps 3 and 5, to a finding that the claimant is disabled…. If a claimant reaches step 5, the burden shifts to the ALJ to establish that the claimant is capable of performing work in the national economy.").

This Court reviews the Commissioner's decision to ensure that the decision is supported by substantial evidence and that no mistakes of law were made.   It is important to recognize that the scope of review is limited.   "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . ." **42 U.S.C. § 405(g)**.   Thus, this Court must determine not whether Mr. Trexler was, in fact, disabled at the relevant time, but whether the ALJ's findings were supported by substantial evidence and whether any errors of law were made.   See, **Books v. Chater, 91 F.3d 972, 977-78 (7th Cir. 1996)** (citing **Diaz v. Chater, 55 F.3d 300, 306 (7th Cir. 1995)**).

The Supreme Court has defined "substantial evidence" as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." **Richardson v. Perales, 91 S. Ct. 1420, 1427 (1971).**   In reviewing for "substantial evidence," the entire administrative record is taken into consideration, but this Court does <u>not</u> reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ.   **Brewer v. Chater,**

4

**103 F.3d 1384, 1390 (7th Cir. 1997)**.   However, while judicial review is deferential, it is not abject; this Court does not act as a rubber stamp for the Commissioner.   See, **Parker v. Astrue, 597 F.3d 920, 921 (7th Cir. 2010), and cases cited therein.**

## The Decision of the ALJ

ALJ Scurry followed the five-step analytical framework described above.   He determined that plaintiff had not worked at the level of substantial gainful activity since the alleged onset date.   He found that plaintiff had severe impairments of lumbar degenerative disc disease status post-fixation at L5-S1, spondylosis, broad based disc bulges, cervical degenerative disc disease, arthritis in the left foot, bone spur in the right foot, gout, noncritical coronary artery disease, chronic left bundle branch block, and chronic obstructive pulmonary disease.   The ALJ found that plaintiff had additional impairments that were not severe, including depression and anxiety.   He further determined that plaintiff's impairments do not meet or equal a listed impairment.

The ALJ found that Mr. Trexler had the residual functional capacity (RFC) to perform work at the sedentary exertional level, with a number of physical limitations, but no mental limitations.   Based on the testimony of a vocational expert, the ALJ found that plaintiff was not able to do his past relevant work.   He was, however, not disabled because he was able to do other jobs which exist in significant numbers in the local and national economies.

## The Evidentiary Record

The Court has reviewed and considered the entire evidentiary record in

5

formulating this Memorandum and Order.   The following summary of the record is directed to the points raised by plaintiff and is confined to the relevant time period.

### 1.    Agency Forms

Plaintiff was born in 1963, and was almost 46 years old on the alleged onset date of March 30, 2009.  (Tr. 174).  He had worked as a construction laborer from the 1990s through April, 2009.   (Tr. 180).

In his initial Disability Report, plaintiff said he was unable to work because of a heart condition, emphysema, a lower back condition and high blood pressure. (Tr. 179).    Plaintiff submitted a Function Report in February, 2010, in which he stated that he had difficulty with memory and concentration because of his medication, and had trouble completing tasks and in understanding and following instructions.   (Tr. 198-206).   In May, 2010, he reported that he was taking Lexapro for anxiety and depression.   (Tr. 213).   In March, 2011, Dr. Rachel Myers increased his "stress medication."   (Tr. 235).

### 2.    Evidentiary Hearing

Mr. Trexler was represented by an attorney at the evidentiary hearing on October 27, 2011.   (Tr. 40).

Plaintiff testified that he was unable to work because of his back.   He had fusion surgery, but continued to have back pain.   He took pain medication.   He also took medication for depression, COPD and blood pressure.   (Tr. 54-55).   He had daily pain in his back which radiated into his hips and made it hard to lift his legs.   He also had neck pain.   He could be up on his feet for 30 minutes to an hour,

and would then have to lie down.  (Tr. 63).   Reaching out in front or overhead caused him pain in his neck and back.   (Tr. 65).   He had chest pain almost every day.  (Tr. 66).

Plaintiff's counsel asked him to describe how his depression affected him. He answered as follows:

> Depression gives me fatigue, tiredness, not wanting to be around anybody else, just lots of different ways.   It's hard to say exactly how.

(Tr. 67).   He also testified that "This is something that happens daily."   (Tr. 67).

A vocational expert (VE) also testified.   The ALJ asked the VE a hypothetical question which comported with the ultimate RFC assessment, that is, a person of plaintiff's age and work history who was able to do work at the sedentary exertional level, limited to only occasional stooping, kneeling, and crouching, no climbing of ladders, ropes or scaffolds, and no concentrated exposure to environmental irritants and poor ventilation.   The VE testified that this person could not do any of plaintiff's past work, but there were other jobs in the economy which he could do.   Examples of such jobs are stuffer, table worker, and bench hand.   (Tr. 75-77).

### 3.    Medical Treatment

Mr. Trexler received primary health care from several doctors at Rural Health Clinic.   In 2008 and 2009, he was seen by Dr. Brian Reach there.   Dr. Reach noted that he had back pain, COPD and high blood pressure.   (Tr. 327).   In November, 2008, Dr. Reach noted that he had been diagnosed with sleep apnea and was using a CPAP unit. (Tr. 324).   On March 2, 2009, a few weeks before the

alleged onset date, he was sentenced to 10 days in jail on a DUI charge.   (Tr. 323).

In May, 2009, Dr. Reach noted that he was having tiredness on exertion, as well as

fleeting chest pains.   He was "still battling in the court system" and had a "chaotic

life at home."   He had depression, but no thoughts of suicide.   Dr. Reach

diagnosed treatment-resistant depression, and questioned whether he might have

"some atypical bipolar."   (Tr. 322).

In June, 2009, plaintiff had an abnormal stress test.   Dr. Son Phong Le then

performed a cardiac catheterization, which showed no coronary artery disease.

He had wall motion abnormality which was treated with medicine.   (Tr. 702-703).

Dr. Adrian Feinerman performed a consultative physical examination at the

request of the agency in October, 2009.   (Tr. 368-377).   He noted that, in addition

to his physical conditions, plaintiff was taking Lexapro prescribed by his family

doctor for depression.   (Tr. 371).   The examination, which took 20 minutes, was

normal.   Dr. Feinerman notes that plaintiff was oriented to person, place and time,

and that his memory, concentration and ability to relate were normal.   He did not

include depression in his "diagnostic impression."   (Tr. 373-374).

In December, 2009, Dr. Riffey at Rural Health noted that plaintiff's

depression was getting worse.   Plaintiff wanted to try to quit smoking.   Dr. Riffey

felt that he should not prescribe Chantix for smoking cessation as it might worsen

his depression.   (Tr. 491).

Dr. Gordon Chu evaluated plaintiff for low back pain radiating in to the hips

in January, 2008, and continued to see him periodically.   (Tr. 496-500).

Ultimately, Dr. Chu performed fusion surgery at L5-S1 in February, 2010.   (Tr.

8

658).   In July, 2010, Mr. Trexler continued to have low back pain and left thigh numbness.   Dr. Chu noted that he had a possible L2-3 disc herniation, and ordered an MRI study.   (Tr. 679).   The MRI showed bulging of the disc at L4-5, but no herniation at L2-3.   He ordered a discogram.   (Tr. 678).   In September, 2010, Dr. Chu concluded that his pain was likely caused by a tear in the disc at L4-5, above the level of the fusion.   Plaintiff indicated that his pain level was tolerable, so Dr. Chu advised him to wait and see if his back pain might improve or stabilize.   (Tr. 676-677).

Dr. Earnheart at Rural Health increased the dosage of Lexapro in April, 2010, because plaintiff was having increased anxiety.   He denied suicidal ideation. (Tr. 723).   Three weeks later, he had not noticed any difference, and was unable to sleep because of racing thoughts.   Trazodone was added, to be taken at bedtime. (Tr. 722).

Mr. Trexler was seen at Rural Health five more times in 2010, with no mention of depression or anxiety in the notes.   Four of those visits were with Dr. Rachel Myers.   (Tr. 716-720, 746-747).

Dr. Myers saw plaintiff for a "routine visit" and another "disability exam" on May 23, 2011.   Dr. Myers had done a disability exam the previous November, and noted that he should not need another one.   Mr. Trexler reported that he was taking 3 doses of MS Contin a day, and 6 Vicodin tablets, and that his pain control was improved.   He also reported that his depression was "still very poorly controlled."   She administered a PHQ-9 screening, which resulted in a score of

21.[3]

Mr. Trexler reported that he felt down/depressed and hopeless.   He felt tired and had little energy.   He felt bad about himself and had trouble concentrating.   Dr. Myers' physical diagnoses were chronic neck pain, controlled on MS-Contin and Vicodin; bilateral foot pain; and atypical chest pain most likely from poorly controlled reflux.   The mental health diagnosis was depression, poorly controlled. She increased the dosage of Effexor.   (Tr. 825-826).

Dr. Myers saw plaintiff on June 4, 2011, to follow-up on a hospital visit for urinary obstruction.   There was no mention of his mental health status.   (Tr. 823-824).

On July 6, 2011, plaintiff told Dr. Myers that his depression was not well controlled.   He was having suicidal ideation, but had not acted on those thoughts. She discontinued Effexor and started him on Citalopram (Celexa).   (Tr. 944-945). He came in for follow-up on August 9, 2011.   He was no longer having suicidal thoughts, but reported no improvement in his other depressive symptoms.   He was still having "issues with focus, concentration, fatigue, motivation, feeling down and not so good appetite."   Dr. Myers recommended that he stay on Citalopram for another month.   If he did not experience significant improvement, she would consider increasing the medication or switching to another class of medication. (Tr. 941-943).

There are only two more visits with Dr. Myers.   She saw plaintiff on

---

[3]  The Patient Health Questionnaire (PHQ-9) is a "multipurpose instrument for screening, diagnosing, monitoring and measuring the severity of depression."   A score of over 21 indicates a provisional diagnosis of "major depression, severe."  http://www.cqaimh.org/pdf/tool_phq9.pdf, accessed on June 11, 2014.

September 9, 2011, for an acute exacerbation of his lumbar pain.   She prescribed Flexeril and a Medrol Dosepak.   On September 23, 2011, his back pain was significantly better.   On physical exam, he was able to forward flex to about 60 degrees, and had a normal range of motion of the lumbar spine in all other respects. He was to continue taking Flexeril.   There was no mention of his mental health status in either note.   (Tr. 939-940).

### 4.   Dr. Myers' Opinions

In November, 2010, Dr. Myers completed a form in which she assessed plaintiff's physical capacities.   Dr. Myers opined that Mr. Trexler was significantly limited.   For example, she indicated that he could never lift or carry any weight, even objects weighing less than 10 pounds.   He could sit or stand for 2 hours at a time but was limited to a total of 2 hours standing/walking a day.   He required a sit/stand option and would need to take an unscheduled break for 15 to 30 minutes about every hour.   The form did not ask any questions about mental limitations. (Tr. 726-731).

In June, 2011, Dr. Myers completed a second assessment of plaintiff's physical limitations.   The form that was submitted to her was somewhat different from the first form, but, like the first form, it did not ask her to rate the patient's mental limitations.   (Tr. 819-821).

### 5.   RFC Assessment

In March, 2010, a state agency consultant evaluated plaintiff's physical RFC based upon a review of the records.   (Tr. 535-542).

There was no mental RFC assessment.

## Analysis

The Court turns first to plaintiff's point about the analysis of his mental limitations, as that point is dispositive.

At step two of the sequential analysis, ALJ Scurry concluded that plaintiff's depression and anxiety were medically determinable impairments, but they were not "severe."   "A "severe" impairment is one that "significantly limits [the claimant's] physical or mental ability to do basic work activities." 20 C.F.R. §404.1520(c).   Basic work activities are "the abilities and aptitudes necessary to do most jobs.   20 C.F.R. §404.1521(b).   That subsection goes on to give examples of basic work activities; the examples include mental activities such as understanding, carrying out and remembering simple instructions; use of judgment; responding appropriately to supervisors, co-workers and usual work situations; and dealing with changes in a routine work setting.

The ALJ discussed plaintiff's mental impairments in the last paragraph at Tr. 13.   The only reference to the medical evidence was an acknowledgment that Dr. Reach noted in May, 2009, that plaintiff had been diagnosed with depression and anxiety and was taking psychiatric medication.   The ALJ referred to plaintiff's testimony that he had "problems with depressed mood that makes him feel tired and avoid other people." The ALJ then stated that plaintiff had "never sought psychiatric treatment" and "has not alleged that any mental impairments affect his ability to work."   ALJ Scurry concluded that, therefore, plaintiff's mental impairments were not severe.

20 C.F.R. §404.1520a(a) provides that, "when we evaluate the severity of

mental impairments for adults . . . we must follow a special technique at each level in the administrative review process."   The regulation goes on to state that use of the special technique helps the agency to:

> (1) Identify the need for additional evidence to determine impairment severity;
>
> (2) Consider and evaluate functional consequences of the mental disorder(s) relevant to your ability to work; and
>
> (3) Organize and present our findings in a clear, concise, and consistent manner.

§404.1520a(a).

The special technique requires the ALJ to rate the degree of functional limitation in "four broad functional areas."   The four functional areas are "activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation."   §404.1520a(c).   *After* the degree of functional limitation has been rated, the ALJ is to determine whether the mental impairment is severe.   If so, the ALJ is to go on and determine whether the mental impairment meets or equals a listed impairment.   If a listing is not met, the ALJ is to assess the claimant's mental RFC.   §404.1520a(d).   In assessing RFC, the ALJ is required to consider all of the claimant's medically determinable impairments, including those that are not severe, and the assessment is to be based on all relevant medical and other evidence in the record.   20 C.F.R. §1545(a).   The ALJ is required to document the employment of the special technique in his written decision. §404.1520a(e).

Obviously, ALJ Scurry did not comply with §404.1520a.   The question is

whether, as the Commissioner argues, the failure to do so can be excused as harmless error.

An ALJ's error is harmless where, having looked at the evidence in the record, the Court "can predict with great confidence what the result on remand will be." ***McKinzey v. Astrue*, 641 F.3d 884, 892 (7th Cir. 2011).**

The Seventh Circuit has considered whether the failure to use the special technique is harmless in two cases, ***Craft v. Astrue*, 539 F.3d 668 (7th Cir. 2008)**,and ***Pepper v. Colvin*, 712 F.3d 351 (7th Cir. 2013).**

In ***Craft***, the Seventh Circuit found that the failure to use the special technique required remand because "the ALJ's failure to consider the functional impairments during the special technique analysis was compounded by a failure of analysis during the mental RFC determination. . . ." ***Craft*, 539 F.3d at 675**. The "failure of analysis" was a failure to build an "accurate and logical bridge" between the mental medical evidence and the ALJ's conclusions about the plaintiff's mental limitations.   ***Craft*, 539 F.3d at 677-678.**

On the other hand, in ***Pepper***, the Seventh Circuit found that the failure to use the special technique was harmless error because the ALJ's discussion made it "apparent the ALJ considered all the relevant information and factors required." ***Pepper*, 712 F3d at 366**.   Notably, the evidence included a report by a reviewing psychologist who concluded that there had been no psychiatric or mental medical treatment before the date last insured, and that was insufficient evidence to establish the existence of any mentally disabling impairment during the relevant

time period.  **Pepper, 712 F3d at 358-359**.   The evidence also included a negative depression screening.  **Pepper, 712 F3d at 366**.

After careful consideration, this Court concludes that ALJ Scurry's failure to employ the special technique cannot be excused as harmless error.   This case is similar to **Craft** in that ALJ Scurry failed to build the requisite logical bridge between the evidence and his conclusions.

The ALJ failed to consider all of the relevant medical evidence.   The Commissioner argues that ALJ Scurry "acknowledged the scant evidence in the record regarding Plaintiff's depression and anxiety."   Doc. 27, p. 16.   This Court disagrees.   Both the ALJ and the Commissioner omit any discussion of Dr. Myers' office notes regarding depression.   In May, 2011, Dr. Myers administered a depression screening which suggested a diagnosis of major depression, severe. Subsequent notes reflect difficulty in controlling plaintiff's depression and complaints of suicidal ideation and difficulty with focus, concentration, fatigue, and motivation.   These records were not discussed by the ALJ in determining whether Mr. Trexler's depression was a severe impairment or in assessing his RFC.

The ALJ relied on the lack of "psychiatric treatment" in determining that plaintiff's depression was not severe.   This reliance is misplaced.   Again, the ALJ ignored all of Dr. Myers' treatment of plaintiff's depression.   Perhaps the ALJ's point was that plaintiff was not treated by a psychiatrist.    If so, he erred in failing to consider why plaintiff had not sought treatment from a psychiatrist. See, **Pepper, 712 F.3d at 367**, recognizing that "why a claimant failed to undergo treatment is one factor to consider when assessing an impairment. . . ."   Notably, there is no

indication that the doctors at Rural Health ever suggested that plaintiff see a mental health specialist or referred him to a psychiatrist.

The ALJ also relied on his perception that Mr. Trexler did not allege that mental impairments affected his ability to work.   This conclusion ignores Mr. Trexler's testimony about how his depression affected him:

> Depression gives me fatigue, tiredness, not wanting to be around anybody else, just lots of different ways.   It's hard to say exactly how.

(Tr. 67).   The agency has described the mental demands of work as follows:

> The basic mental demands of competitive, remunerative, unskilled work include the abilities (on a sustained basis) to understand, carry out, and remember simple instructions; to respond appropriately to supervision, coworkers, and usual work situations; and to deal with changes in a routine work setting. A substantial loss of ability to meet any of these basic work-related activities would severely limit the potential occupational base.

SSR 85-15, 1985 WL 56857, at *4.   Nowhere did the ALJ discuss whether daily fatigue and a desire to avoid being around other people affected the plaintiff's ability to carry out the basic mental demands of work.

Lastly, the Commissioner argues that none of the medical opinions indicated that plaintiff had limitation in his work abilities because of his mental impairments. Doc. 27, p. 16.   This argument is somewhat disingenuous in that none of the doctors were even asked to assess plaintiff's mental limitations.   Further, there was no psychological consultative exam, no Psychiatric Review Technique form completed by a state agency consultant, and no assessment of mental RFC performed by a state agency consultant.

One of the purposes of the special technique is to help the agency to "identify the need for additional evidence to determine impairment severity."

16

§404.1520a(a).   Had the ALJ employed the special technique, he might well have determined that additional information was needed to properly assess plaintiff's mental limitations.   See, **Richards v. Astrue, 370 Fed. Appx. 727, 730-731 (7th Cir. 2010).**

An error is harmless where "it is predictable with great confidence that the agency will reinstate its decision on remand because the decision is overwhelmingly supported by the record though the agency's original opinion failed to marshal that support. . . ."  **Spiva v. Astrue, 628 F.3d 346, 353 (7th Cir. 2010).**   This Court cannot excuse the ALJ's failure to employ the special technique here because his ultimate conclusion that Mr. Trexler had no mental limitations is not overwhelmingly supported by the record.   This is not to say that the record compels the opposite conclusion.   Rather, this Court concludes only that, upon proper consideration of all relevant evidence, the ALJ "might well have reached a different conclusion."   **Ibid.**   In that case, the error is not harmless.

## Conclusion

The Commissioner's final decision denying Arthur Trexler's   application for social security disability benefits is **REVERSED** and **REMANDED** to the Commissioner for rehearing and reconsideration of the evidence, pursuant to sentence four of 42 U.S.C. §405(g).

The Clerk of Court is directed to enter judgment in favor of plaintiff.

**IT IS SO ORDERED.**

**DATE:        June 13, 2014.**

17

**<u>s/ Clifford J. Proud</u>**
**CLIFFORD J. PROUD**
**UNITED STATES MAGISTRATE JUDGE**